## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

| | |
|---|---|
| **COMMERCE BANK & TRUST COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.** |
| ) | **08-40054-FDS** |
| **v.** ) | |
| ) | |
| **TD BANKNORTH, INC., TD BANK FINANCIAL GROUP, THE TORONTO-DOMINION BANK, and COMMERCE BANCORP, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

———————————————————————

## MEMORANDUM ON PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

**SAYLOR, J.**

This is an action for trademark infringement. Plaintiff Commerce Bank & Trust Company ("Commerce Bank") is a bank headquartered in Worcester, Massachusetts. In March 2008, defendants Toronto-Dominion Bank, TD Bank Financial Group, and TD Banknorth, Inc., announced plans to merge TD Banknorth with Commerce Bancorp, Inc. ("Commerce Bancorp"). Defendants have announced that they intend to rename the combined entities "TD Commerce Bank." Commerce Bank has moved for a preliminary injunction against the defendants' use of the "Commerce Bank" or "TD Commerce Bank" marks.

The Court granted Commerce Bank's motion in a preliminary injunction order dated May 7, 2008. This memorandum sets forth the basis for that decision.

I.      **Factual Background**

A.      **Commerce Bank**

Commerce Bank is a bank headquartered in Worcester, Massachusetts, with twelve branches located in the central part of the commonwealth.[1]  It has operated continuously since 1955.  It offers a wide variety of banking services to the public, including commercial and consumer loans and mortgages as well as various deposit products and services.  It has more than 30,000 current customers; its deposit customers are heavily concentrated in Worcester County, with some number in adjoining Middlesex County.  Its assets are approximately $1 billion.

Approximately one-third to one-half of Commerce Bank's business is in commercial lending.  It holds interests in nearly 3,000 loans in Massachusetts with a total value approximating $321 million dollars.  (Thompson Aff., ¶¶ 2-3).  The following represents the outstanding value of its loans, broken down by county of the borrower's principal place of business or home:

Worcester:  $175 million;
Middlesex:  $65.2 million;
Suffolk:  $29.5 million;
Norfolk:  $19.3 million;
Essex:  $16.85 million;
Hampshire:  $7.23 million;
Dukes:  $3 million;
Plymouth:  $1.67 million;
Barnstable:  $1.218 million.[2]
Bristol:  $824,307;
Hampden:  $168,014;

---

[1]  Specifically, it has four branches in Worcester and branches in Holden, Leominster, Shrewsbury, Marlborough, Milford, Westborough, Webster, and West Boylston, Massachusetts.  All but one are in Worcester County; the Marlborough branch is in Middlesex County.

[2]  Barnstable County data was omitted from the affidavit submitted by plaintiff that provided the county-by-county loan breakdown.  On May 7, 2008, the Court accepted plaintiff's in-court proffer as to the amount for Barnstable County.

> Berkshire:  $114,103;
> Franklin:  $83,122;
> Nantucket:  $2,476;

(*Id.* at ¶ 4).  The outstanding value of its loans in other states are as follows:  Connecticut, $21.5

million; Rhode Island, $4.16 million; New Hampshire, $3.96 million; and Maine, $2.23 million.

*Id.* at ¶ 5.

Commerce Bank has used the "COMMERCE BANK" mark in connection with its

banking business in Massachusetts continuously since 1955.  In 2002, it received Massachusetts

Service Mark Registration No. 62,238 for the "COMMERCE BANK" mark.

Commerce Bank uses a logo consisting of a stylized lion's head in a circle, colored blue

and gold followed by the words "Commerce Bank."  Although plaintiff's formal name is

Commerce Bank & Trust, Co., in advertising and marketing plaintiff refers to itself almost

exclusively as "Commerce Bank."

Commerce Bank has used the mark on its physical facilities and in advertising and

promotion activities throughout central Massachusetts.  Since 2000, it has expended

approximately $6.3 million on marketing and advertising featuring the mark.  Its advertising

campaign for the past several years has focused on promoting Commerce Bank employees and

their long-standing ties to the communities where bank branches are located.  (*See* Pl. Ex. D).

The bank's website notes that "Commerce Bank will never be one of the 'Big Banks' . . . we

don't change our name (and who knows what else?) every 6 months to reflect the latest mega-

merger."

Commerce Bank has also sought to enhance the public profile of its mark through

sponsorships of local community activities and programs.  In 2007, it donated $1 million to

restore the high school sports stadium complex in Worcester.  The facility is now called

"Commerce Bank Field at Foley Stadium" and prominently displays the "COMMERCE BANK"

mark throughout the facility.  Commerce Bank also sponsors the Worcester Sharks of the

American Hockey League and the Worcester Tornadoes of the Can-Am League, an independent

baseball league.

### B.      Merger of Commerce Bancorp and TD Banknorth

Commerce Bancorp is a New Jersey bank with more than 470 branches in New Jersey,

New York, Connecticut, Pennsylvania, Delaware, the District of Columbia, Maryland, Virginia,

and Florida.  It has no branches in Massachusetts and is not registered to do business in the

commonwealth.  It began using the "Commerce Bank" mark in 1973 and received a federal

registration for that mark in 2002.

The Toronto-Dominion Bank is a Canadian bank with a principal place of business in

Toronto, Ontario.  TD Bank Financial Group and TD Banknorth are wholly-owned subsidiaries.

TD Banknorth is a bank with a principal place of business in Portland, Maine.  TD Banknorth has

assets of more than $60 billion and has a large commercial and retail presence in New York and

New England.[3]  It has more than 150 branches in Massachusetts and holds $7.5 billion in assets

derived from Massachusetts customers.  Among other things, TD Banknorth holds the naming

rights to the stadium (TD Banknorth Garden) used by the Boston Celtics basketball team and the

Boston Bruins hockey team.

On March 19, 2008, Commerce Bancorp and TD Banknorth announced publicly that they

intended to merge.  The parties stated that they planned to operate in all states, including

---

[3] The Toronto-Dominion Bank has assets of more than $422 billion.

Massachusetts, as "TD Commerce Bank."  Also on March 19, the Toronto-Dominion Bank filed

two federal intent-to-use applications for the trademark registration of "TD Commerce Bank" and

"TD COMMERCE BANK."

On March 19, Commerce Bancorp and TD Banknorth issued press releases concerning the

merger and took out full-page advertisements in the Boston Globe and the Worcester Telegram &

Gazette newspapers.  These advertisements stated that "TD Banknorth will soon merge with

Commerce Bank and, subject to regulatory approvals, we will soon become known as TD

Commerce Bank."  (Thompson Aff. ¶¶ 26-27).  The merged entity plans to use a visual mark

consisting of a logo with the stylized letters "TD" written in white against a green background in

a small box, followed by the words "Commerce Bank."  The spoken representation of the mark is

planned to be "TD Commerce Bank."

### C.    Alleged Confusion of Commerce Bank Customers and Instant Dispute

Commerce Bank contends that in the days and weeks after the "TD Commerce Bank" full-

page advertisement appeared, it began receiving expressions of confusion from its customers.

According to Commerce Bank's records, customers inquired (1) whether Commerce Bank was

being merged into or acquired by TD Banknorth and (2) whether they could begin depositing their

paychecks at TD Banknorth branches.  (*Id.* at ¶¶ 35-36; Ex. V).  Commerce Bank also received

an e-mail on March 2l, 2008, two days after the advertisement ran, from a representative of Easter

Seals expressing thanks for the bank's assistance.  This e-mail stated: "Thank you for your kind

words Lisa.  Through Commerce Bank, *or I should say TD Commerce*, Easter Seals message and

vision continues to grow."  (Thompson Aff., ¶ 37; Ex. W) (emphasis added).

Upon learning of the merger, Commerce Bank immediately notified the defendants in

writing of its ownership of the "COMMERCE BANK" mark and requested that the defendants refrain from using the mark in Massachusetts.[4]  On March 31, 2008, Commerce Bank filed this action.  The complaint asserts claims for (1) false designation of origin under Section 43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a) ("the Lanham Act"), (2) trademark infringement in violation of Mass. Gen. Laws ch. 110H, § 12, (3) trademark dilution in violation of Mass. Gen. Laws ch. 110H, § 13, (3) unfair competition, and (4) unfair and deceptive practices in violation of Mass. Gen. Laws ch. 93A §§ 2, 11.  Commerce Bank seeks an order requiring the defendants to refrain from using the marks "TD Commerce Bank," "TD COMMERCE BANK," "Commerce Bank" or any other similarly confusing mark in connection with banking services in Massachusetts.

## II.   **Legal Analysis**

To obtain a preliminary injunction in a trademark case, a party must show (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm, (3) that the balance of equities is in its favor and (4) that the granting of the injunction will not adversely affect the public interest.  *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.,* 82 F.3d 542, 544 (1st Cir. 1996).

### A.   **Likelihood of Success on the Merits**

Plaintiff contends that it is likely to succeed on the merits of its claims of confusion under the Lanham Act and infringement and dilution under Massachusetts law.  With respect to the

---

[4] At some point in 2002, Commerce Bank learned that Commerce Bancorp was considering expanding its banking operation into Massachusetts.  On October 29, 2002, Commerce Bank sent a letter to Commerce Bancorp demanding that it respect Commerce Bank's "prior and superior legal rights" to the "COMMERCE BANK" service mark in Massachusetts.  (Pl. Ex. E).  Commerce Bancorp did not respond.

claim of confusion, plaintiff must prove (1) ownership of a protected mark and (2) use by another

in commerce that is likely to cause confusion as to the source of goods or services.  *See, e.g.,*

*Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1006 (D. Mass. 1988).[5]

Plaintiff does not advance an ordinary confusion claim—that is, one in which an

established senior user asserts that a smaller junior user is diverting the senior user's customers

and free-riding on the senior user's pre-existing reputation and goodwill.  Rather, the present

action is a so-called "reverse confusion" case.  *See generally Attrezzi, LLC v. Maytag Corp.*, 436

F.3d 32 (1st Cir. 2006).  Reverse confusion occurs when a large or well-established junior user

enters a new market and threatens to overwhelm a smaller senior user.  In such a case, damage

can result either because (1) current or prospective customers of the senior user associate the

senior user's services with services offered by the junior user, or (2) because the junior user's use

of the mark "saturates and the market and overwhelms the senior user" such that "the senior user

loses the value of the trademark, its product identity, corporate identity, control over its goodwill

and reputation, and ability to move into new markets."  *Id.* at 39 (quoting *Ameritech, Inc. v. AM*

*Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).

As the Third Circuit has noted, the doctrine of "reverse confusion" should be applied with

some care.  *See A & H Sportswear, Inc. v. Victoria's Secret Stores*, 237 F.3d 198, 228 (3d Cir.

2000).  The court there observed that "the chief danger inherent in recognizing reverse confusion

claims is that innovative junior users, who have investing heavily in promoting a particular mark,

will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or

promoted, their own marks.  Further, an overly-vigorous use of the doctrine of reverse confusion

---

[5]  Defendants do not dispute plaintiff's Massachusetts ownership of the "COMMERCE BANK" mark.

could potentially inhibit larger companies with established marks from expanding their product lines . . . ."  *Id.* (citation omitted).  Furthermore, "selection of a mark with a [relatively common name] naturally entails a risk of some uncertainty and the law will not assure absolute protection."  *Id.* at 227.  The doctrine, nonetheless, protects important interests that are relevant here.  *Id.* ("without the existence of such a claim, smaller business owners might not have any incentive to invest in their marks at all, for fear the mark could be usurped at will by a larger competitor").

### 1.    The Protectability of Commerce Bank's Trademark

Whether a mark is afforded trademark protection depends upon where the mark fits along a spectrum of categories that includes generic, descriptive, suggestive, arbitrary, and fanciful marks.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

A generic term that identifies a kind of product, but does not distinguish its source (such as "restaurant" or "store"), is not afforded trademark protection.  *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979).  A descriptive mark, which portrays a characteristic of the product to which it refers, is entitled to protection only if it has acquired "secondary meaning" such that consumers associate the product with a particular source.  *See Calamari Fisheries*, 698 F. Supp. at 1006-07 (D. Mass. 1988).

In contrast, suggestive, arbitrary, and fanciful marks identify the particular source of a product and are considered "inherently distinctive."  *See Two Pesos*, 505 U.S. at 768.  A mark is suggestive if it requires "imagination, thought and perception to reach a conclusion as to the nature of [services]."  *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995).  Inherently distinctive marks are protected from the time of initial use without proof of

secondary meaning.  *Id.*

Although the issue is close, the mark "COMMERCE BANK" is properly classified as suggestive rather than distinctive.  Some words often used in the names of banking institutions— such as "Community," "National," or "Mutual," for example—are descriptive of a specific characteristic of such an institution.  The term "Commerce," by contrast, requires some exercise of imagination.  It does not simply describe the type of bank that it is, but rather is intended to create an image of a bank that promotes commerce, or serves commerce, and is therefore a good place to do business.

That conclusion is reinforced by positions taken by defendant Commerce Bancorp in other proceedings.  On September 14, 2000, Commerce Bancorp sought to register the mark "Commerce Bank (with stylized C logo)" in the U.S. Patent and Trademark Office ("PTO").  (Pl. Ex. A).  The PTO examining attorney initially found the term "Commerce" to be descriptive and required the bank to disclaim the term "Commerce" on the ground that it denotes the buying and selling of goods.  (*Id.* at 2).

Commerce Bancorp appealed to the U.S. Trademark Trial and Appeal Board ("TTAB"), arguing that the term was suggestive, not merely descriptive.  *Id.* at 4.  Specifically, Commerce Bancorp argued that "Commerce" did not convey an "immediate idea" about Bancorp's banking services, and noted that "providing loans for buying and selling goods," arguably an immediate impression of "Commerce," was "not a significant feature from the standpoint of [Bancorp's] average consumer."  *Id.* at 14.  The TTAB ultimately adopted Bancorp's reasoning and reversed. (Pl. Ex. B).  *See Attrezzi*, 436 F.3d at 38 (1st Cir. 2006) (noting that "it [did] not help" alleged infringer's case when infringer claimed mark was descriptive but had previously contended it was

suggestive in PTO registration proceedings).

In addition, in November 2007, Commerce Bancorp opposed a federal application for mark registration filed by Commerce Bank of Colorado. *(See* Compl. Ex. 1). There, Commerce Bancorp argued that the applicant's use of the mark "Commerce Bank" in connection with banking services was "likely to cause confusion, mistake, and deception as to the source, origin, sponsorship, or association of the services, and will injure [Commerce Bancorp]." *(Id.* at ¶ 9). Commerce Bancorp did not argue that its stylized C graphic was dominant but, rather, that the phrase "COMMERCE BANK" was dominant. It thus claimed that the applicant's "Commerce Bank" mark was "identical phonetically and in appearance and commercial impression to the dominant portion of the 'COMMERCE BANK' mark under which [Bancorp] traded since 1973." (Complt. Ex. I at ¶ 9).

The Court agrees with Commerce Bancorp that the mark is suggestive. Alternatively, and at a minimum, if the "COMMERCE BANK" mark is descriptive, it has acquired secondary meaning in at least some geographic areas. Specifically, it has acquired secondary meaning in Worcester County, and adjacent areas of Middlesex County, based on the bank's extensive advertising, promotion, community involvement, and long-standing successful operation. *See, e.g., President and Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 808 (1st Cir. 1975); *Boustany v. Boston Dental Group, Inc.*, 42 F. Supp. 2d 100, 107 (D. Mass. 1999); *Equine Techs.*, 68 F.3d at 547. Thus, under either a "suggestive" and "descriptive" analysis, Commerce Bank's mark is ultimately protectable.

### 2.      Likelihood of Confusion

The key element in any infringement action is likelihood of confusion. *Calamari*

*Fisheries*, 698 F. Supp. at 1009.  To determine whether there is a likelihood of consumer confusion of two competing marks, the Court must consider at least the following factors:

> (1) the similarity of the marks; (2) the similarity of . . . the [parties'] services; (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

*Attrezzi*, 436 F.3d at 39.

### (a)      Similarity of Marks

When determining the similarity of two marks, a court should consider the "sight, sound and meaning" of the marks.  *Boustany*, 42 F. Supp. 2d at 108.  In the end, the determination of whether the marks are similar should be based on "the total effect of the designation, rather than a comparison of individual features."  *Id.*

Here, the total effect of the two marks is more than enough to show substantial similarity. The words "Commerce Bank" are virtually identical; the stylized "TD" and lion logos are the only apparent distinction.

The *visual* similarity of the two marks is much stronger than the spoken similarity. Visually, the "TD" portion of defendant's mark is in the nature of a logo—white letters stylized in a green box.  Like the lion in plaintiff's mark, the logo portion of defendants' mark appears separate from the name, leaving the viewer with the strong visual impression of the words "Commerce Bank."  When the brands are spoken, the confusion is somewhat less, as defendants contend the name will be verbalized as "TD Commerce Bank."  The relatively smaller chance of spoken confusion does not, however, outweigh the great risk of visual confusion.  Furthermore, while the addition of the letters "TD" arguably diminishes the chance of confusion, because the

11

alleged harm is *reverse* confusion, to the extent TD Commerce Bank is the more recognized label, the linkage could actually aggravate the threat to plaintiff.  *See Attrezzi*, 436 F.3d at 39.

Accordingly, the Court concludes that the marks are strongly similar when viewed, and substantially similar when spoken.

(b)      <strong><u>Similarity of Services</u></strong>

The parties offer essentially identical services:  retail and commercial banking services. *See Calamari Fisheries*, 698 F. Supp. at 1010.

(c)      <strong><u>Relationship between the Parties' Channel of Trade, Juxtaposition of Advertising, and Classes of Prospective Purchasers</u></strong>

The relationship between the parties' channels of trade, the relationship between their advertising, and the classes of their prospective purchasers are normally considered together.  *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 488 (1st Cir. 1981); *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass. 1995).  Commerce Bank and the merged entity are directly competing companies, although plaintiff is a relatively small operation compared to the merged entity.  Both parties thus operate in essentially identical channels of trade, both advertise using similar media and methods, and both have the same classes of prospective purchasers.

(d)      <strong><u>Evidence of Actual Confusion</u></strong>

Actual confusion "is often taken to be the most persuasive possible evidence that there is a likelihood of confusion.  Actual confusion is such persuasive evidence that even a minimal demonstration of actual confusion may be significant."  *Boustany*, 42 F. Supp. 2d at 110 (quoting *Copy Cop*, 908 F. Supp. at 45).

12

Here, plaintiff has produced substantial evidence of actual confusion.  As noted above, in the days and weeks immediately following the merger announcement, plaintiff received customer calls and e-mails asking whether the bank was being merged into or acquired by TD Banknorth, and whether they could begin depositing their paychecks at TD Banknorth branches.  (Pl. Ex. V).  Furthermore, plaintiff received an e-mail from a commercial associate (Easter Seals) exhibiting actual confusion.  (Pl. Ex. W).  This confusion stemmed from a single advertisement appearing in two newspapers—the Boston Globe and the Worcester Telegram & Gazette—on a single day.[6]

It is a reasonable inference that as advertising increases, actual confusion as to whether plaintiff had been merged or acquired would also increase.  While it is true that banking is a somewhat unique product, and customers are likely to invest a great amount of care in their banking decisions, actual confusion between the marks can nonetheless cause substantial harm.  For example, although a banking customer is unlikely to make a deposit (successfully) in the wrong bank, a customer might nonetheless attempt to use (or even successfully use, for a fee) the wrong bank's ATM.  To cite another example, a potential customer, learning from a friend of the good reputation and excellent service of "Commerce Bank," might walk into TD Commerce Bank to open a new account.  *See Boustany*, 42 F. Supp. 2d at 110-111 (preliminary injunction granted when potential customers of plaintiff "Boston Dental" tried to make appointments with offices operated by defendant "Boston Dental Group, Inc").  At this stage of the proceedings, evidence of actual confusion is sufficiently potent to enhance significantly plaintiff's chances of success at trial.

### (e)       Defendant's Intent in Adopting Mark

---

[6] The defendants have not yet otherwise advertised the merger in any substantial way.

Plaintiff has presented no evidence that defendants, in adopting the "TD Commerce Bank" mark, intended to create confusion.  Although plaintiff has shown that Commerce Bancorp was on notice of its position as early as October 2002, given the national nature of defendants' merger and the relatively small size and commercial magnitude of plaintiff's operations, this was clearly not a "copycat" situation.  The Court finds that the plaintiff will not likely succeed in proving at trial that defendants chose the new mark with the intention of appropriating to itself goodwill established by plaintiff.

**(f)**    **Strength of Commerce Bank's Mark**

"Commerce Bank" is a suggestive mark, and suggestive marks are generally considered strong marks.  *See Calamari Fisheries*, 698 F. Supp. at 1013.  Defendants have, however, presented evidence showing that at least 90 U.S. banks are presently using the name "Commerce" in some form, and nearly 600 U.S. banks have used it in the past.  (O'Brien Decl., ¶ 2).  Defendants contend that such extensive third-party of the "Commerce" mark shows that the mark lacks both conceptual and commercial strength.  *See Carefirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 270 (4th Cir. 2006); *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 654 (10th Cir. 1996); *Empire Nat. Bank of Traverse City v. Empire of America FSA*, 559 F. Supp. 650, 655 (W.D. Mich. 1983).

The mark "Commerce" is at the weaker end of the "suggestive" spectrum, and is not strong conceptually.  Nonetheless, the mark is strong commercially in Worcester County and adjacent portions of Middlesex County.  The widespread use of the "Commerce" mark by other banks does not dictate a different result; due to regulatory restrictions, the banking market is very clearly defined by state boundaries, and the existence of "Commerce Banks" in states is largely

14

irrelevant as those banks do not compete with Commerce Bank and are not potential competitors

except in the remotest sense.  No other bank in Worcester County, or in Massachusetts, uses the

same or a similar name to Commerce Bank.  The Court concludes that Commerce Bank is likely

to establish at trial that its mark has substantial commercial strength.

### 3.     Conclusion

In light of the favorable findings on the majority of the factors listed above, the Court finds

that plaintiff is likely to succeed at trial in proving that defendants' use of the mark "TD

Commerce Bank" creates a likelihood of confusion.  Accordingly, as plaintiff has established both

that it owns a protectable mark and that defendants' use of the "TD Commerce Bank" mark is

likely to cause confusion, Commerce Bank has demonstrated a likelihood of success on the

merits.

### B.     Irreparable Harm to Commerce Bank

In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff

demonstrates a likelihood of success on the merits.  *See Camel Hair & Cashmere Inst. v. Assoc.

Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986) (holding that "where there is a high

probability of consumer confusion, injury irreparable in the sense that it may not be fully

compensable in damages almost inevitably follows"); *see also Hypertherm, Inc. v. Precision

Prods., Inc.*, 832 F.2d 697, 699-700 (1st Cir. 1987).  Plaintiff here is at risk of continuing and

irreparable harm to its protectable trademark interests because it has established a substantial

likelihood of success on the merits.

### C.     The Balance of Harms

In weighing the balance of harms resulting from the granting or denial of a preliminary

injunction in a trademark infringement case, it is generally true that the "harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms.  The Court is to consider the potential legitimate harm to the defendants owing to the injunction as balanced against the degree of plaintiff's likelihood of success on the merits." *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 97-98 (D. Mass. 1996).  Here, the Court finds that the possibility of harm to the plaintiff, in light of its showing of a likelihood of success at trial, has not been outweighed by any possible harm to the defendants arising from its inability to use the mark.  Thus, the Court holds that the balance of harm weighs in plaintiff's favor.

### D.   **The Public Interest**

In trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions."  *Fritz*, 944 F. Supp. at 97 (citing *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)).  Plaintiff here has demonstrated a likelihood of consumer confusion, and that showing "is enough to place the weight of public interest concerns in favor of granting the injunction."  *Boustany*, 42 F. Supp. 2d at 113.

### E.   **Geographic Scope of Injunction**

A party's protectable trade area is specifically "delimit[ed] . . . by examining the party's reputation, advertising, and sales with respect to the territory in question."  *Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc.*, 639 F. Supp. 750, 753 (D. Mass. 1986), *aff'd*, 831 F.2d 1177 (1st Cir. 1987).  In evaluating any given geographic area, the test is "whether the party's mark is sufficiently known there . . . to create a likelihood of confusion among consumers, should a second user enter the same territory."  *Thrifty Rent-A-Car*, 639 F. Supp. at 753.  Plaintiff contends that this Court should grant injunctive relief covering the whole of Massachusetts.

16

Defendants contend that the Court tailor any preliminary relief to prevent, at most, the operation of "TD Commerce Bank" branches within Worcester County, and the use of the "TD Commerce Bank" mark in advertising channels that principally target customers located in Worcester County. Both parties have proffered evidence on the issue.

Defendants have submitted evidence showing that only 4.7% of the Boston Globe's paid Sunday circulation is in Worcester County (26,809 out of 574,781) and just under 5% of the Globe's paid daily circulation is in Worcester County (19,169 out of a total of 384,461). (Cannan Aff., ¶ 2). Commerce Bank has submitted media research data showing that Worcester County is part of the Boston television market's "Designated Market Area" ("DMA"). (Pl. Ex. A). Worcester County contains 12.7% of the television households (302,010 out of 1,928,530) in the Boston DMA. (*Id.*).

Although Commerce Bank has relatively few retail banking customers in Middlesex County, and few, if any, in Essex, Norfolk, and Suffolk Counties, it has $130 million in outstanding loans with residents and business owners in those counties.[7] That is a significant sum—approximately 40% of Commerce Bank's entire commercial lending business. Moreover, Commerce Bank's center of retail and lending operation (Worcester County) falls squarely into the Boston media market. County residents receive Boston network television stations and at least some read Boston-based newspapers and periodicals.

Although the record at this preliminary stage of the proceedings is less than

---

[7] Defendants contend that the only metric provided by plaintiff—outstanding value of loans broken down by county of the borrower's principal place of business or home—is unduly narrow and may present a misleading picture as to the true geographic scope of Commerce Bank's lending activities. The Court is satisfied that the record supports the present application of the injunction to the counties outside of Worcester County.

complete, the Court concludes that the injunction should cover Worcester County and the four principal counties covering metropolitan Boston (Essex, Middlesex, Norfolk, and Suffolk Counties).  An injunction covering only Worcester County (and the media originating therefrom) would be unlikely to stem actual confusion as against the tide of Boston-based "TD Commerce Bank" advertisements that would likely pervade the area.[8]

The Court declines, however, to extend the reach of the injunction to any other Massachusetts counties.  The remaining counties in western Massachusetts (Hampshire, Hampden, Berkshire, and Franklin) and southeastern Massachusetts (Dukes, Plymouth, Bristol, Nantucket, and Barnstable) have very few Commerce Bank retail banking customers, and outstanding loan values in those counties, combined, total only $15 million.  Furthermore, these counties contain no dominant media centers that extend their reach into Worcester County in any substantial way, at least according to the current record.

## III.  <u>Conclusion</u>

For the foregoing reasons, the motion of plaintiff Commerce Bank & Trust Co. for a preliminary injunction is GRANTED.  Defendants TD Banknorth, Inc.; TD Bank Financial Group; The Toronto-Dominion Bank; and Commerce Bancorp, Inc.; are hereby preliminarily restrained and enjoined as follows:

1.   For the purposes of this Preliminary Injunction Order, the following definitions shall apply:

---

[8]  Defendants contend that plaintiff's assertions concerning Boston media could apply equally to national media (such as out-of-state newspapers, such as the New York Times or the Providence Journal, or national cable television broadcasts).  Plaintiff seeks, at most, an injunction covering media originating in Massachusetts.  The Court accordingly does not need to consider enjoining advertisements carried in media originating out-of-state.

a.    "Defendants" shall mean TD Banknorth, Inc.; TD Bank Financial Group; The Toronto-Dominion Bank; and Commerce Bancorp, Inc.

b.    The "Protected Mark" shall mean "TD Commerce Bank" and "Commerce Bank."

c.    The "Market" shall mean Worcester, Middlesex, Suffolk, Norfolk, and Essex Counties, Massachusetts.

d.    "Direct Mailing" shall mean any direct mail, e-mail, fax, or similar communication of marketing, advertising, sales, or promotional information or materials specifically directed to individual consumers.

e.    "Advertisement" shall mean any advertisement, flyer, brochure, billboard, display, television commercial, radio commercial, or similar communication of marketing, advertising, sales, or promotional information or materials directed to the general public or segments of the general public.

2.    Defendants shall not use or display the Protected Mark in the Market in connection with the provision of banking services.

3.    Defendants shall not use or display the Protected Mark in any Direct Mailing to persons residing in the Market.

4.    Defendants shall not use or display the Protected Mark in any Advertisement that will be or is intended to be circulated, displayed, or broadcast in the Market; provided, however, that Defendants may use or display the Protected Mark in an Advertisement that is circulated or broadcast by means of media that are not published in, are not broadcast from, or otherwise do not originate in the Market.

19

By way of example only, and without limitation, Defendants may not advertise the Protected Mark in newspapers published in Boston or Worcester, or on television or radio stations broadcast from Boston or Worcester, but may advertise the Protected Mark in newspapers published in Connecticut, Rhode Island, or New Hampshire, or on television stations broadcast from Connecticut, Rhode Island, or New Hampshire, or on cable television broadcasts originating outside of the Market, carried on local cable networks to subscribers in the Market.

5.     Notwithstanding the foregoing, Defendants may engage in the following activities; provided, however, that Defendants do not suggest, directly or indirectly, that Defendants are using, or intend to use, the Protected Mark in connection with the provision of banking services in the Market:

a.     Defendants may use the terms "TD Commerce Bank," "Commerce Bank," and "Commerce Bancorp" in communications with their current customers in connection with the merger of TD Banknorth and Commerce Bancorp, including, without limitation, communications regarding the impact or potential impact of the merger on such customers or their accounts or information required to be provided by regulators;

b.     Defendants may use the full and accurate legal names of The Toronto-Dominion Bank; TD Banknorth Inc.; TD Banknorth, N.A.; Commerce Bancorp Inc.; Commerce Bancorp LLC; Commerce Bank, N.A.; and Commerce Bank/North, or any of their subsidiaries, in connection with acquisition or merger transactions involving those entities.

6.      This Order is binding upon Defendants and their agents, servants, and employees, and upon all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

7.      This Order shall take effect upon the posting of a bond as set forth below, and shall remain in effect until the conclusion of the trial of this matter; provided, however, that it may be dissolved or modified upon appropriate motion and a showing of good cause to this Court.

8.      Plaintiff shall post a bond in the amount of $100,000 as soon as reasonably practicable after entry of this Order.


**So Ordered.**

                                                              /s/    F. Dennis Saylor
                                                              F. Dennis Saylor IV
Dated:  May 20, 2008                                          United States District Judge